

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 6, 2010                **United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SURETY CAPITAL CORPORATION, | § | CASE NO. 07-45637-DML-11 |
| | § | |
| DEBTOR. | § | |
| | | |
| RICHARD N. ABRAMS, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADV. NO. 09-04257-DML |
| | § | |
| BANK OF TEXAS, N.A., | § | |
| | § | |
| DEFENDANT. | § | |

### MEMORANDUM OPINION

Before the court is *Bank of Texas, N.A.'s Motion For Attorneys' Fees And Costs Pursuant To The Indenture, Fed. R. Civ. P. 54, and Fed. R. Bankr. P. 7054* (the "Motion") in which Bank of Texas, N. A. (the "Bank") seeks to compel Richard N. Abrams ("Abrams") to pay its attorneys' fees and costs, in the amount of $53,898.94,

which it asserts it incurred by defending the instant adversary proceeding. Abrams responded to the Motion by *Richard N. Abrams' Response To Bank of Texas, N.A.'s Motion For Attorneys' Fees And Costs* (the "Response"). The court conducted a hearing on the Motion on February 22, 2010 (the "Hearing"), during which the court heard argument from counsel for the Bank and Abrams, as well as receiving testimony from Riley Salyer, a vice president and regional manager for the Corporate Trust Division of the Bank, and Abrams. The Bank also offered various exhibits, which are identified below as necessary.

This matter is subject to the court's jurisdiction pursuant to 28 U.S.C. § 1334(b). This memorandum opinion embodies the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 7054.[1]

## I. Background

Surety Capital Corporation ("Debtor") filed for relief under chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*) on December 21, 2007. *Debtor's First Amended Plan of Reorganization, As Modified* (the "Plan") was confirmed on October 3, 2008,[2] and Debtor's case was closed on April 16, 2009. On or about July 6, 2009,

---

[1] The Motion was brought pursuant to Rule 7054(b), which allows the court to award costs, but unlike FED. R. CIV. P. 54(d), does not provide for attorneys' fees. However, the leading bankruptcy treatise suggests attorneys' fees may be awarded under Rule 7054(b) in appropriate circumstances. *See* 10 COLLIER ON BANKRUPTCY ¶ 7054.05 (15th ed. rev. 2009). Those circumstances include when fees are provided for by agreement of the parties. The Indenture dated March 31, 1998 (the "Indenture"), so provides.

[2] On or about April 22, 2008, prior to confirmation of the Plan and pursuant to a court order, Debtor paid the Bank $4,350,000 representing principal on the Notes (the term "Notes" is given the meaning it is afforded in the Indenture), which the Bank promptly distributed to the Holders (the term "Holder" is given the meaning it is afforded in the Indenture) of the Notes.

Abrams filed an action in state court in order to recover attorneys' fees and costs of collection paid from funds disbursed by Debtor to the Bank for the Bank's work as Trustee[3] for the period prior to February 6, 2007 (the "State Court Action").[4] Debtor's case was reopened on August 4, 2009, on motion of the Bank, so that the Bank could remove the State Court Action to this court. The removal occurred the same day and so initiated the instant adversary proceeding (the "Adversary").

On August 9, 2009, the Bank filed *Bank of Texas, N.A.'s Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)* (the "Dismissal Motion") and Abrams responded on October 12, 2009, by *Richard N. Abrams' Response to Motion to Dismiss Under Federal Civil Rule of Procedure 12(b)(6)* (the "Dismissal Response"). After a hearing, held on October 14, 2009, the court took the Dismissal Motion and Dismissal Response under advisement. The court subsequently issued a letter ruling on November 23, 2009 (the "Letter Ruling"), which instructed the Bank to submit an order granting the

---

The Plan provided that Debtor was to pay the Bank approximately $3,200,000 within 10 days of the Plan's Effective Date (defined below), which the Bank would subsequently distribute pursuant to the terms of the Indenture.

Effective Date, is defined in the Plan as follows:

"means the date that is 11 days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day, or such later date after the Confirmation Date as determined by the Debtors so long as no stay of the Confirmation Order is in effect on such date; provided, however, that if on or prior to such date, all conditions to the Effective Date set forth in Section 10 hereof have not been satisfied or waived, then the Effective Date shall be the first Business Day following the day on which all such conditions to the Effective Date have been satisfied or waived or such later date as the Debtors may determine."

The court assumes, having no evidence to the contrary, that the Effective Date was the first business day at least 11 days after confirmation. The court further assumes the Bank paid the interest on the Notes 10 days after the Effective Date.

[3] "Trustee" is given the definition that it is given in the Indenture dated March 31, 1998 (the "Indenture").

[4] The Bank's status as Trustee prior to February 6, 2007, was the subject of dispute.

Dismissal Motion.[5] On December 7, 2009, the court entered the order dismissing Abrams's complaint in the Adversary.

## II. Discussion

By the Motion the Bank seeks to compel Abrams to pay attorneys' fees and costs that it incurred in defending itself in the State Court Action and then the Adversary. The Bank argues that it is entitled to such payment pursuant to section 514 of the Indenture or, alternatively, on equitable grounds.[6]

Section 514 of the Indenture provides:

In any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, a court may require any party litigant in such suit to file an undertaking to pay the costs of such suit, and may assess costs against any such party litigant, in the manner and to the extent provided in the Trust Indenture Act; provided that neither this Section nor the Trust Indenture Act shall be deemed to authorize any court to require such an undertaking or to make such an assessment in any suit instituted by the Company.

The language of the Indenture incorporates the requirements and limitations of section 315(e) of the Indenture Act into the analysis of whether attorneys' fees should be awarded to the Bank by providing that fees may be awarded "in the manner and to the extent provided in the Trust Indenture Act."

---

[5] In the Letter Ruling the court concluded that the causes of action brought by Abrams in the State Court Action were *res judicata* and should have been raised before confirmation of the Plan.

[6] The Bank argues that Debtor has a duty under the Indenture to indemnify the Bank for its legal expenses and that it may look to Abrams to satisfy its right to reimbursement under the Indenture because Abrams was the majority shareholder of Debtor. The court need not consider this argument because the court is awarding the Bank's fees pursuant to the statutory right to reimbursement found in section 315(e) of the Trust Indenture Act of 1939 (the "Indenture Act") (15 U.S.C. §§ 77aaa, *et seq.*).

**A. Good Faith**

Section 315(e) of the Indenture Act, which allows a court to award attorneys' fees and costs to a trustee for defending suits against it, requires that a court pay "due regard to the merits and good faith of the claims or defenses made by such party litigant" before awarding fees to the trustee against such party. Thus, if the court concludes Abrams was proceeding in good faith it must weigh that against awarding fees to the Bank.

Though the court cannot find that Abrams's conduct in pursuing the fees paid to the Bank was undertaken in bad faith, neither can it find that his conduct was undertaken in good faith. Abrams could have and, as the court opined in the Letter Ruling, should have brought the causes of action underlying the Adversary as objections to the confirmation of the Plan, if not earlier. Pursuit of his causes of action in the Adversary amounted to a collateral attack on issues that had already been disposed of by the order confirming the plan, and thus Abrams was precluded from raising them in the State Court Action by the doctrine of *res judicata. See Stoll v. Gottlieb*, 305 U.S. 165 (1938); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).[7]

The mere fact that the causes of action at issue in the Adversary are barred by the doctrine of *res judicata* would not necessarily, absent more, support an award of attorneys' fees. However, Abrams was very active in Debtor's bankruptcy case[8] and even objected to confirmation of the Plan, though not on the grounds that he raised in the

---

[7] That the issues raised by Abrams were disposed of by prior orders of the court also addresses the merits of his claims. Not having been brought timely, whatever merit the State Court Action might once have had, Abrams's suit is no more meritorious than if it were barred by a statute of limitations.

[8] The Bank has suggested that Abrams's participation in Debtor's case was purely obstructive to the chapter 11 process. However, on at least one occasion Abrams provided benefit to Debtor, *inter alia*, by opposing relief sought by Debtor which might have eliminated tax benefits Debtor may be able to utilize.

Adversary.[9] Indeed, Abrams was well-represented in Debtor's chapter 11 case and surely could have and should have recognized his potential dispute with the Bank prior to confirmation of the Plan; while the court is not prepared to find that Abrams willfully "laid behind the log" respecting the claims made in the State Court Action — thus obtaining the benefits of the Plan without airing complaints regarding the Bank which might have derailed the Plan's implementation — at a minimum his conduct amounted to inexcusable neglect.

Further, in a clear parallel with *Stoll* and *Shoaf*, two other parties to the bankruptcy case objected to the Bank's fees, giving notice to Abrams — prior to confirmation — that an issue regarding the Bank's fees existed. Given that Abrams was active in the bankruptcy case and that other parties objected to the Bank's fees, thereby unquestionably giving Abrams ample notice of the issue, the court will not deny the Bank's attorneys' fees on the basis of Abrams's good faith.

The court thus concludes that, being clearly barred by the doctrine of *res judicata*, Abrams's claims were without merit. In the absence of meritorious claims or demonstrable good faith, the court must exercise the discretion afforded by the Indenture and section 315 of the Indenture Act to award the Bank its fees and costs, unless such an award is otherwise improper. Abrams argues that an award of fees and costs is, in fact, not proper, either because of the extent of his holdings of the Notes or because he was doing no more than seeking to increase distributions to the Holders of the Notes.

**B. Holder of 10%**

---

[9] Abrams's objection to confirmation of the Plan did not raise any issue respecting the Bank.

Section 315(e) of the Indenture Act provides that a trustee is not entitled to attorneys' fees for defending a suit that is brought by "any indenture security holder, or group of indenture security holders, holding in the aggregate more than 10 per centum in principal amount of the indenture securities outstanding." In the Response Abrams argues that the Bank is not entitled to attorneys' fees under section 315(e) of the Indenture Act because the total of Notes outstanding under the Indenture was $4,350,000, and he "owned Notes in the aggregate principal amount of $550,000."

The court disagrees. "Holder" is defined in the Indenture.[10] "Holder":

> …means, with respect to any Note, the person in whose name such Note is registered on the Note Register.

Pg 4 of the Indenture.

The 10 per cent holder exception found in section 315(e) of the Indenture Act does not allow for a court to award attorneys' fees to a trustee for defending suits that are brought by a party or parties "holding" more than 10 per cent of the principal of outstanding notes. Black's Law Dictionary defines "holding" as, "[l]egally owned property, esp. land or securities." *Black's Law Dictionary* 749 (8th ed. 2004). This definition and the plain meaning of section 315(e) make it clear that the term "holding" applies to the time the suit is brought. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at

---

[10] "Holder" is not defined in the Indenture Act or the other two securities acts that were adopted during the Great Depression in order to regulate the financial system – the Securities Act of 1933 and the Securities Exchange Act of 1934. The court has found no cases under the Indenture Act or the other statues that would support adoption of a definition of "Holder" other than that found in the Indenture. The definition of "Holder" in the Indenture is consistent with the reference to "holder[s] of record" in, *inter alia*, FED. R. BANKR. P. 3018(a). *See, however, In re Southland Corp.*, 124 B.R. 211 (Bankr. N.D. Tex. 1991).

odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982); *U.S. v. Osborne*, 262 F.3d 486, 490 (5th Cir. 2001) ("We give effect to plain, unambiguous language, unless a literal interpretation would produce an irrational result."). Therefore, in order for the 10 per cent holder exception to apply, the party or parties bringing a suit must hold at least 10 per cent of the principal of outstanding notes on the date the suit is commenced. If Congress had intended the 10 per cent exception to be read more broadly it would have used language to that effect by using a word more broad than the present participle, "holding." In short, the plain meaning of section 315(e) requires that the plaintiffs in an action, to have the benefit of the 10 per cent exception, must be holders of 10 per cent in principal amount of the issued securities at the time suit is brought.

Abrams commenced the State Court Action on or about July 6, 2009. As of that date, he was not a Holder of more than 10 per cent of the principal amount of the indenture securities outstanding. If Abrams was the registered Holder of more than 10 per cent of the principal amount of the Notes at some point prior to the commencement of the State Court Action, he was not such a Holder on the date the State Court Action was commenced.[11]

Prior to March 27, 2008, Abrams was the owner of Note No. 4[12] which was in the principal amount of $400,000.[13] On March 27, 2008, Abrams, via letter with a notarized

---

[11] Indeed, Abrams, as discussed below, ceased holding 10 per cent of the Notes – if he ever held that proportion – more than a year before commencing the State Court Actions.

[12] Note No. 4 was assigned to Abrams by Capital Transamerica Corporation on or about April 22, 2002. *See* EX 5B. It appears however that Note No. 4 was never registered in Abrams's name. *See* EXs 5B, 5C, and 5D.

[13] In paragraph 5 of the Motion the Bank states: "[D]uring the pendency of the Bankruptcy Case, Abrams revealed that he was also the holder of a Note in the principal amount of $400,000." The

assignment, instructed the Bank to assign Note No. 4 to Rodney A. Abrams. Pursuant to this letter the Bank cancelled Note No. 4 and registered Note No. R6 to Rodney A. Abrams.[14] Upon the cancellation of Note No. 4 and the issuance of Note No. R6, Abrams was no longer the Holder of Note No. 4 within the meaning of the Indenture. At the Hearing Abrams testified that he assigned the $400,000 Note to Rodney A. Abrams as payment on a debt he owed Rodney A. Abrams and that, pursuant to an agreement between himself and Rodney A. Abrams, he would be entitled to a portion of the interest paid on the Note. While this may be true — the court need make no finding regarding this testimony — after assigning Note No. 4 to Rodney A. Abrams, Abrams was simply not its Holder as that term is defined in the Indenture.[15]

In the Response Abrams claims that he owned Notes in the aggregate amount of $550,000. Therefore, after subtracting Note No. 4 with a principal value of $400,000, the highest value of Notes that Abrams could have owned as of the commencement of the State Court Action was in the principal amount of $150,000. Even if Abrams in fact was a Holder of Notes with an aggregate principal value of $150,000,[16] he would not qualify as the Holder of more than 10 per cent of the principal amount of the Notes.

---

Bank also states that it paid Abrams the principal and interest on that amount. The court believes this was a misstatement by the Bank. At the Hearing the Bank offered evidence that shows that Abrams was not the Holder of the $400,000 Note. Further, Abrams admitted that he assigned the Note to Rodney A. Abrams.

[14] Abrams testified that Note No. R6 was never registered to Rodney A. Abrams. The evidence, however, shows that it was. *See* EXs 5 and 5E.

[15] Even if Abrams were a "Holder" of rights to interest in the Note, that could not be equated to being a Holder of the Note as to its principal amount.

[16] The Bank contends that Note No. 82, of which Abrams claims ownership, in principal amount of $100,000, was held by Julia Martinez. By the time of commencement of the State Court Action, Ms. Martinez was Abrams's wife.

**C. Type of Cause of Action**

Section 315(e) of the Indenture Act provides that the court may award attorneys' fees to the trustee for defending suits "for the enforcement of any right or remedy under such indenture, or in any suit against the trustee for any action taken or omitted by it as trustee," provided, however, that fees may not be awarded for defending a suit "instituted by any indenture security holder for the enforcement of the payment of the principal of or interest on any indenture security, on or after the respective due dates expressed in such indenture security."

In the Response Abrams claims that he instituted the State Court Action in order to seek "enforcement of his right to be paid the full amount of interest he was entitled to receive on account of his ownership of Notes." Therefore, argues Abrams, the Bank is not entitled under section 315(e) to receive attorneys' fees for defending against his claims.

In *Richard N. Abrams' First Amended Original Complaint* (the "Complaint"), Abrams sought declaratory judgment that the Bank's attorneys' fees and costs of collection paid for work done prior to February 6, 2008, were not recoverable under the Indenture and should only have been charged to the Holders of Notes who retained it. In

---

Abrams was apparently the beneficial owner of Note No. 62 in the principal amount of $50,000. EX 5E shows "Pershing" as the "Owner at Tender." However, Riley Salyer testified that Abrams was in fact the beneficial owner of the Note.

The persons or companies listed as the "Owner at Tender" on EX 5E are Holders of the Notes as defined by the Indenture. Even if Abrams was the Holder of Note No. 62 and Note No. 82, the total principal of these notes is not 10% of the aggregate principal of all of the Notes.

support of declaratory judgment, Abrams pled "Breach of Contract," "Negligence/Wilfull Misconduct," and "Breach of Fiduciary Duty/Conspiracy."[17]

By the Complaint Abrams did not seek a judgment that the Bank had failed to pay principal or interest, and not one of his causes of action supports a finding that he sought such relief. While the effect of a judgment in favor of Abrams could have been a distribution of interest to the Holders of the Notes, that was not the purpose of his suit.[18] The court does not understand the Indenture Act to bar the award of attorneys' fees in *any* suit in which an incidental effect of a successful suit would be to increase the distribution to note holders; if this were the case it would be unlikely that attorneys' fees would be awarded in many suits by note holders against trustees because in many such suits a likely effect would be an increase in the distribution to note holders.

**D. Reasonableness of Fees**

By the Motion the Bank has requested that it be awarded $53,898.94 in attorneys' fees and costs for defending the State Court Action and the Adversary. Though Abrams did not object to the reasonableness of the Bank's attorneys' fees and costs, the court must still ensure that the fees it awards are reasonable. *See* Indenture Act § 315(e); *Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188 (5th Cir. 1990).

---

[17] These are the headings given to the causes of action in the Complaint. Courts of course may read beyond headings and look to the substance of pleadings. *See, e.g., Armstrong v. Capshaw, Goss & Bowers, LLP*, 404 F.3d 933, 936 (5th Cir. 2005). Looking to the content of the Complaint the court concludes that the headings accurately describe the causes of action asserted in the Complaint.

[18] Though the court has found no case law or other authority explaining the nature and extent of the exception for suits brought to cause payment of principal and interest, logic suggests that it is intended to cover suits brought to cause a trustee to disburse funds it holds in accordance with the underlying indenture rather than to provide coverage for a suit such as the State Court Action, which amounted to an attack on fees paid to the Trustee, which, if successful, would incidentally make additional funds available for distribution against the Notes.

At the Hearing the Bank presented evidence, including time records and two sworn statements, to support its claim. *See* EX 3 and EX 4. After considering the evidence presented by the Bank, the court finds that the attorneys' fees and costs the Bank incurred in defending the State Court Action and Adversary were reasonable and necessary to its defense.

The court, however, does not consider awarding attorneys' fees for preparation of the Motion, which itself seeks payment of attorneys' fees, to be appropriate. The court has discretion under section 315(e) of the Indenture Act when awarding fees under its provisions. Consequently, the court will reduce the Bank's fees by $7,922, the amount the court concludes, based on the time records submitted by the Bank, was spent preparing the Motion.

### III. Conclusion

Abrams brought the State Court Action in order to recover fees paid to the Bank pursuant to the Indenture for its work as Trustee. Though Abrams did not bring the State Court Action in bad faith, he also did not bring it in good faith considering its timing — post-confirmation — and the fact that he had actual knowledge of the potential issues prior to confirmation because, *inter alia*, other parties objected to the Bank's attorneys' fees and costs. Abrams may be a Holder of $150,000 in principal amount of Notes — the court makes no finding as to whether he is or is not the Holder of such Notes — but this does not amount to 10% of the aggregate principal of all of the Notes.

For the foregoing reasons the court finds that Bank incurred $45,153.94 in attorneys' fees and costs in defending the State Court Action and the Adversary and

concludes that the Bank is entitled to reimbursement from Abrams for such fees and costs by section 515 of the Indenture and section 315(e) of the Indenture Act.

Counsel for the Bank is instructed to submit a judgment in accord with this memorandum opinion.

#### END OF MEMORANDUM OPINION ####